UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 05-CV-0958 (JFB) (AKT)

———————————

ARTHUR THE DOG,

Plaintiff,

VERSUS

U.S. MERCHANDISE INC., BLUE STAR WEBBING CORP. AND CARANGI &
ASSOCIATES GRAPHIC DESIGN & SIGN STUDIO,

Defendants.

———————————

MEMORANDUM AND ORDER
August 28, 2007

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Arthur the Dog ("Arthur the Dog") brings the instant trademark infringement action against defendants U.S. Merchandise Inc. ("U.S. Merchandise"), Blue Star Webbing Corp. ("Blue Star") and Carangi & Associates Graphic Design & Sign Studio ("Carangi"). A settlement agreement between the parties was finalized on May 23, 2006, and was executed by defendants on May 24, 2006 and by plaintiff on June 10, 2006.

Defendants now move for enforcement of the settlement agreement, as well as for attorneys' fees and costs. Defendants also move for sanctions against plaintiff's counsel pursuant to 28 U.S.C. § 1927. For the reasons set forth herein, defendants' motions are granted in part and denied in part.

I. BACKGROUND

A. Facts[1]

Arthur the Dog is a New York corporation that manufactures and sells pet products in retail chain stores, catalogs and over the internet. (Compl. ¶ 5.) Since 1999, plaintiff has used the trademark "Arthur the Dog" in combination with distinctive packaging identifying its products. (*Id.* ¶ 8.) Defendant U.S. Merchandise is a purchaser and wholesale distributor of pet products, including a line of pet wipes called "Riley's

———

[1] The following facts are taken from the complaint and the submissions of the parties and are undisputed unless otherwise noted.

Ruff" pet wipes. (Starnella Decl. ¶ 3.) Defendant Blue Star is a manufacturer and wholesaler of webbing material, which is used in pet products. (*Id.* ¶ 4.) In 2004, Blue Star hired defendant Carangi to design packaging for a line of pet wipes – Riley's Ruff pet wipes – that it intended to sell. (*Id.*) Blue Star used Carangi's packaging and arranged for a Chinese manufacturer to make the wipes, which were sold to both wholesale and retail distributors. (*Id.*) Blue Star purchased 164,448 packs of pet wipes from its Chinese manufacturer. (*Id.*) U.S. Merchandise and Blue Star are wholly unrelated companies; their only relationship to one another is as customer (U.S. Merchandise) and supplier (Blue Star). (*Id.* ¶ 5.)

On December 14, 2004, Tony Guastafeste, president of U.S. Merchandise, received a letter from Lowell Davis ("Davis"), counsel for Arthur the Dog, alleging trade dress infringement of Arthur the Dog's pet wipes packaging and demanding that U.S. Merchandise cease selling Riley's Ruff pet wipes. (*Id.* ¶ 6, Ex. 1.) U.S. Merchandise forwarded the letter to Blue Star. (*Id.*) On January 14, 2005, counsel for U.S. Merchandise responded to Davis' letter and denied the allegations. (*Id.* ¶ 7, Ex. 2.) On February 18, 2005, plaintiff filed the instant complaint, which named U.S. Merchandise as the sole defendant. (Compl. ¶ 4.) On July 20, 2005, plaintiff filed an amended complaint adding defendants Blue Star and Carangi. (Am. Compl. ¶¶ 4a-4b.)

The parties participated in Court-ordered mediation on March 15, 2006. (Starnella Decl. ¶ 19.) On May 23, 2006, the parties finalized a Settlement Agreement ("the Agreement"). (*Id.* ¶ 21, Ex. 10.) Defendants executed the Agreement on May 24, 2006. (*Id.* ¶ 22.) Plaintiff executed the Agreement on June 10, 2006. (*Id.*) The Agreement contemplated that all steps to effectuate the settlement would be completed within sixty days and that the parties would file a stipulation of dismissal of the action with prejudice within that time. (*Id.*)

The Agreement provides that defendants will deliver to plaintiff's counsel "the total sum of Defendants' cumulative net profits ('profits') from the sale and distribution of the Riley's Ruff$^{TM}$-brand pet wipes prior to December 31, 2005." (*Id.*, Ex. 10.) Under the Agreement, Arthur the Dog's accountant was to determine the cumulative net profits based upon documentation provided by defendants. (*Id.*) The Agreement states that, if defendants "thwart" plaintiff's efforts, the calculations must be performed by a certified public accountant appointed by the mediator, at defendants' expense. (*Id.*) The accountant hired by plaintiff determined that the cumulative net profit owed to plaintiff was $262,649.20. (*Id.*, Ex. 21.) Defendants objected to the methodology and conclusions of plaintiff's accountant. (*Id.*, Exs. 23, 24.) At a status conference before the Magistrate Judge, the parties agreed to participate in a conference call with plaintiff's accountant in order to address the purported errors in the calculations. (*Id.* ¶ 51, Ex. 23.) However, plaintiff's counsel later declined to participate on the basis that he did not believe a call was necessary. (*Id.* ¶ 40.)

On September 21, 2006, following lengthy and contentious communications between the parties regarding Arthur the Dog's accountant's conclusions, defendants exercised their veto power regarding the profit calculation and asked the mediator to appoint a neutral accountant, pursuant to Paragraph 5 of the Agreement:

5. Veto Power over ATD's Determination of Profits. Defendants have the right to veto the amount of cumulative profits calculated by ATD's accountant. Defendants must exercise this veto power within ten (10) calendar days of ATD's submission of the report of its accountant describing the manner in which Defendants' cumulative profits were determined and the amount of Defendants' cumulative profits. Should this veto power be exercised, [the mediator] will appoint a second CPA ("Alternate CPA") to review ATD's accountant's report and its conclusions. The Parties will share equally in the Alternate CPA's fees.

(Starnella Decl. ¶ 42.) The mediator appointed Scott Kavitt ("Kavitt") as the alternate CPA. Defendants immediately sent a check to Kavitt in the amount of $2,500, representing defendants' share of Kavitt's retainer. (*Id.* ¶ 43.) On September 28, 2006, Kavitt sent the parties an engagement letter and a request for a retainer of $5,000. (*Id.* ¶ 48.) As defendants had already sent a check for $2,500, they did not send any additional payment, but did sign the engagement letter. (*Id.* ¶ 49.) To date, plaintiff has neither signed the engagement letter nor paid the remaining $2,500 of Kavitt's retainer. By email, the parties agreed that defendants would pay the additional $2,500 of Kavitt's retainer, with the caveat that if Kavitt did not request any additional documents that were previously requested by Arthur the Dog's accountant but were not obtained, plaintiff would be liable for its share of the retainer. (*Id.*, Ex. 27.)

By letter dated September 29, 2006, Kavitt requested that defendants produce three additional categories of documents to substantiate his profit calculations, including invoices from U.S. Merchandise to East West Sales Corporation ("East West Sales"), a customer of U.S. Merchandise.[2] (*Id.* ¶ 53.) On October 2, 2006, pursuant to Kavitt's letter, defendants produced certain of the requested documents. (*Id.* ¶ 55.) According to defendants, Kavitt did not, at any time, request documents that plaintiff's accountant had previously requested but did not obtain. (*Id.* ¶ 58.) However, plaintiff contends that Kavitt did request documents that were previously solicited by the plaintiff's accountant, and which were never received by plaintiff. (Davis Decl. ¶ 35.)

On October 18, 2006, Kavitt completed his profit calculations, which indicated that Blue Star had a loss of $26,213.81, U.S. Merchandise earned profits of $23,767.78, and East West Sales earned profits of $4,019,40. (Starnella Decl. ¶ 58, Ex. 30.) During several conference calls with the Magistrate Judge, plaintiff's counsel stated his objections to Kavitt's calculations and requested an opportunity to review the documents that Kavitt had relied upon in reaching his conclusions. (*Id.* ¶¶ 59-61.) On November 8, 2006, the Magistrate Judge ordered Kavitt to provide plaintiff's counsel with the requested documents. Kavitt provided plaintiff's counsel with the documents on November 16, 2006. (*Id.* ¶ 61.) On December 4, 2006, plaintiff's counsel faxed a letter to defendants repeating his objections to Kavitt's calculations and requesting additional discovery. (*Id.* ¶ 68, Ex. 33.)

---

[2] Kavitt also asserted that East West Sales' profits should be considered, and he calculated such profits in his report. (Starnella Decl., Exs. 28, 30.)

On December 19, 2006, defendants sought permission from the Court to initiate the instant motions. At oral argument on the pending motion to enforce the settlement, plaintiff's counsel conceded that plaintiff has abandoned its previous efforts to obtain additional discovery or challenge the numbers arrived at by Kavitt. Instead, plaintiff maintains that plaintiff is entitled to $27,787.18 based on the meaning of "cumulative net profits" in the Agreement, which represents defendants' cumulative profits (as well as those of East West Sales) absent any deduction for defendants' losses.

B. Procedural History

On December 19, 2006, defendants sent a letter to the Court requesting a conference concerning a proposed motion to enforce the Agreement and for sanctions against plaintiff's counsel. The matter was fully briefed as of March 28, 2007. Oral argument was held on July 10, 2007.

II. MOTION TO ENFORCE SETTLEMENT

A. Standard of Review

"A district court has the power, and indeed the duty, to enforce summarily, on motion, a settlement agreement reached in a case pending before it." *Lindner v. Am. Express Corp.*, No. 06-CV-3834 (JGK), 2007 U.S. Dist. LEXIS 41178, at *8 (S.D.N.Y. Jun. 5, 2007) (citing *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)) (additional citations omitted); *accord Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir. 1977); *Delyanis v. Dyna-Empire, Inc.*, 465 F. Supp. 2d 170, 173 (E.D.N.Y. 2006) (quoting *Comm'n Express Nat'l, Inc. v. Rikhy*, No. 03-CV-4050 (CPS), 2006 U.S. Dist. LEXIS 8716, at *6 (E.D.N.Y. Feb. 16, 2006)).

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Omega Eng'r, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) (citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)); *see also Goldman v. Commissioner of Internal Revenue*, 39 F.3d 402, 405 (2d Cir. 1999) ("As the settlement agreement constituted a contract, general principles of contract law must govern its interpretation.") (citations omitted); *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). As "[t]he enforceability of contracts generally is a question of state law, not federal law," New York State Law "should be applied in order to determine the enforceability of the agreement." *Rosenberg v. Inner City Broad Corp.*, No. 99-CV-9579 (AKH), 2001 U.S. Dist. LEXIS 13192, at *7 (S.D.N.Y. Aug. 30, 2001) (footnotes omitted).

Under New York law, a stipulation or settlement is generally binding on parties "that have legal capacity to negotiate, do in fact freely negotiate their agreement and either reduce their stipulation to a properly subscribed writing or enter the stipulation orally on the record in open court." *McCoy v. Feinman*, 785 N.E.2d 714, 719 (N.Y. 2002), modified Mar. 21, 2003 (citing N.Y. C.P.L.R. § 2104 ("An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.")) (additional citations omitted). Similarly, under federal law, "a voluntary, clear, explicit and unqualified stipulation of dismissal entered into by the parties in court and on the record is enforceable even if the agreement is never reduced to writing, signed, or filed." *Powell v. Omnicom*, – F.3d –, No.

4

06-CV-0300, 2007 U.S. App. LEXIS 18661, at *7 (2d Cir. Aug. 7, 2007) (quoting *Role v. Eureka Lodge No. 434, I.A. of M. & A.W. AFL-CIO*, 402 F.3d 314, 318 (2d Cir. 2005) (per curiam)). As set forth below, the instant Agreement clearly satisfies all of the criteria for an enforceable settlement under New York law.

B. Plaintiff's Entitlement to Cumulative Net Profits

In its opposition papers, plaintiff argues that it should be permitted to evade the binding effect of the Agreement pursuant to Paragraph 6, which provides:

> 6. <u>Attempt to Thwart Alternate CPA's Attempts to Calculate Profits</u>. Any attempts by U.S. MERCHANDISE and/or BLUE STAR to thwart the Alternate CPA's attempts to calculate cumulative profits shall result in the Lawsuit being restored to the Court's calendar.[3]

---

[3] In plaintiff's opposition brief, plaintiff also argues that the settlement Agreement should be set aside on the basis of Paragraph 2, which states:

> 2. <u>60-Day Suspension of Courts' Calendar</u>. In order for Defendants' cumulative profits to be determined, the Parties have filed, and the Court has granted, a joint request to stay the Lawsuit for (60) calendar days until June 12, 2006. Any Party may restore the Lawsuit if the dispute and Lawsuit remain unresolved at the end of the sixty (60) day period.

As the sixty day period has long since expired, the Court finds plaintiff's reliance on this provision to be unavailing. Accordingly, to the extent that plaintiff moves to restore this action to the Court's

(Starnella Decl, Ex. 10.) In Kavitt's analysis of the defendants' profits, he concluded that Blue Star had a loss of $26,213.81, U.S. Merchandise earned profits of $23,767.78, and East West Sales earned profits of $4,019,40.[4] (Starnella Decl., Ex. 30.)

Plaintiff claims that defendants breached the Agreement by (1) allowing defendants' counsel, rather than an accountant hired by defendants, to work with plaintiff's accountant to obtain documents necessary for ascertaining cumulative net profits, in violation of Paragraph 3 (*see* Starnella Decl., Ex. 10 ("ATD's accountant shall review such documents and determine the total sum of Defendants' profits on the sale and

---

calendar pursuant to Paragraph 2 of the Agreement, that motion is denied.

[4] According to Kavitt's calculations, Blue Star sold 164,448 pet wipes at a total loss of $26,213.81. (Starnella Decl., Ex. 30.) Of the total sales, 122,544 wipes were sold to Big Lot Stores at a loss of $41,390.16, while the remaining 41,904 wipes were sold at a profit of $15,176.35. (*Id.*) However, in its opposition papers, plaintiff argues that the losses on the sales to Big Lot Stores were never substantiated by documentary proof. (Davis Decl. ¶ 39.) While plaintiff acknowledges that, on September 30, 2006, Big Lots provided a check in the amount of $24,508 to Jelly Gear (the business name of Blue Star, *see* Defs.' Reply Br., at 3) he asserts that further evidence is necessary to demonstrate that Blue Star actually sustained a loss of $41,390.16 on the Big Lots Sales. As a threshold matter, in light of plaintiff's counsel's subsequent statement at oral argument that plaintiff no longer contests Kavitt's calculations, this dispute is moot. In any event, Kavitt's mathematical calculations are binding under the Agreement unless his calculations were thwarted by the defendants. As set forth *infra*, there is no basis to challenge Kavitt's calculations or to find that his efforts were thwarted under the Agreement.

5

distribution of the Riley's Ruff™-brand pet wipes. If additional documents are needed to ascertain cumulative net profits, ATD's accountant will work directly with Defendants' accountants, in good faith to obtain such documents."")); and (2) "preventing anyone other than [defendants] from having any communication with Mr. Kavitt." (Pl.'s Aug. 1, 2007 Letter, at 2.) In response, defendants argue that they have not "thwarted" Kavitt's profit calculations in violation of Paragraph 6. In particular, defendants contend that "at no time did Defendants fail to cooperate with Mr. Kavitt." (Defs.' Reply Ltr., at 2.)

As noted *supra*, plaintiff's counsel abandoned these positions at oral argument. In any event, even if not abandoned (as the second argument was re-asserted in a post-oral argument letter), the Court finds both arguments unpersuasive. The Court rejects plaintiff's first argument as specious in light of Davis' agreement before the Magistrate Judge to work with defendants' attorneys to address the concerns of plaintiff's accountant. (Starnella Decl. ¶ 36.) With regard to plaintiff's second argument, plaintiff has presented no evidence demonstrating that defendants prevented plaintiff from communicating with the independent accountant. Accordingly, the Court finds that plaintiff's attempt to demonstrate a breach of the agreement on the part of defendants is a hollow one. Thus, even if plaintiff did not abandon these objections to the enforcement of the Agreement at oral argument, the Court concludes that both arguments are without merit.

At the time of oral argument, the sole basis for plaintiff's objection to the enforcement of the Agreement centered on its argument as to the meaning of "cumulative net profits" under the Agreement. Specifically, the Agreement provides that defendants will deliver to plaintiff's counsel "the total sum of Defendants' cumulative net profits ('profits') from the sale and distribution of the Riley's Ruff™-brand pet wipes prior to December 31, 2005." (*Id.*, Ex. 10.) Plaintiff argues based on that provision that the meaning of cumulative net profits under the Agreement results in a required payment to plaintiff of $27,787.18 under the above-referenced Kavitt calculations because Blue Star's loss should be considered a zero, rather than a loss, and East West Sales' profits should be included. Therefore, according to plaintiff, the Agreement should not be enforced because: (1) defendants have "thwarted" the calculations of the CPA by contending that plaintiffs are entitled only to "net" cumulative profits after subtracting each defendants' losses; and (2) defendants refuse to provide plaintiff with East West Sales' profits, which amount to $4,019.00, and which, according to plaintiff, should be included in the cumulative profits.

Defendants argue, however, that plaintiff is entitled to no payment under the Agreement based on the numbers arrived at by Kavitt because the losses of Blue Star must be considered in calculating cumulative net profits and East West Sales cannot be considered at all because it is not a defendant in the instant lawsuit. As a threshold matter, defendants note that plaintiff did not raise his objection to the definition of "cumulative net profits" during any of the previous conferences before the Magistrate Judge. (Defs.' Reply Br., at 3.) Moreover, defendants contend that plaintiff's understanding of "cumulative net profits" "flies in the face of the parties' clear intent, their course of dealings and the plain meaning of the term." (*Id.*) With regard to plaintiff's

argument that the net profits of East West Sales should be included in the cumulative net profits, defendants asserted at oral argument that plaintiff's contention is misplaced, as East West Sales is not affiliated with U.S. Merchandise (except as a customer), and explained that East West Sales clearly is not a party to the instant action or to the Agreement.

The Court agrees with defendants as to both arguments. First, the Court finds that the plain and ordinary meaning of "cumulative net profits" requires calculation of the combined total of the profits *and losses* of both defendants. The absence of an "explicit" definition of "cumulative net profits" does not, by itself, render the term ambiguous; rather, "when a contract term is undefined, a court should look to the plain meaning of the language to ascertain whether there is ambiguity." *Lee v. BSB Greenwich Mortg. L.P.*, 267 F.3d 172, 178 (2d Cir. 2001) (citing *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001) ("The fact that the language of the contract itself does not specify the meaning of a disputed term does not entail that an ambiguity . . . exists.")) (additional citations omitted). In this instance, the language of the Agreement is clear and unambiguous, and despite plaintiff's efforts to suggest otherwise, "a party cannot create an ambiguity in an otherwise plain agreement merely by 'urging different interpretations in the litigation.'" *Red Ball Interior Demolition Corp.*, 173 F.3d at 484 (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)); *see also Lee*, 267 F.3d at 179 ("'[A]ny ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.'") (quoting *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 746 A.2d 1277, 1288 (Conn. 2000)). In other words, a court should not "'stretch words to create an ambiguity when their ordinary meaning leaves no room for such doubt.'" *Lee*, 267 F.3d at 178-79 (quoting *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1178 (2d Cir. 1995)). As set forth below, in the instant case, there is no ambiguity in the phrase "cumulative net profits" because its ordinary meaning, as applied here, leaves no room for doubt.

"[N]et profits 'can be defined as the gross amount that would have been received pursuant to the business less the cost of running the business.'" *Electro-Methods, Inc. v. Adolf Meller Co.*, 473 F. Supp. 2d 281, 296 (D. Conn. 2007) (quoting *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*, No. 97-CV-894 (CFD), 2002 WL 229900, at *13 (D. Conn. Feb. 4, 2002)); *Black's Law Dictionary* (8th ed. 2004) (defining net profit as "[t]otal sales revenue less the cost of the goods sold and all additional expenses"); *see also Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1177-78 (S.D.N.Y. 1994) ("The term net profit can easily be defined by reference to an extrinsic standard.") (citing Black's Law Dictionary 939 (5th ed. 1979) ("Net profits. Profits after deduction of all expenses.")), *amended in part on other grounds*, 156 F.R.D. 60 (S.D.N.Y. 1994); *In re PDI Securities*, No. Civ. A. 02-211 (GEB), 2006 WL 3350461, at 22 n.31 (D.N.J. Nov. 16, 2006) ("'[N]et profit' is the revenue less such costs as wages of rank-and-file employees, salaries of administrative personnel, managerial expenses, rent, utilities, fuel, raw materials, research and development, interest on loans, depreciation and corporate taxes.") (citing A. Michell Polinsky, *An Introduction to Law and Economics* 7, at 149 (2d ed. 1989); Charles Horngren, Gary Sundem, John Elliott, *Introduction to Financial Accounting*, at 558-64, 756 (8th ed.

2002)).

When the term "cumulative" is combined with the phrase "net profits," it is abundantly clear what these ordinary terms mean in this Agreement – namely, losses incurred by each defendant over the relevant time period shall be carried forward and considered, along with the profits, in calculating the settlement amount. *See, e.g., United States v. Moore-McCormack Lines, Inc.,* 308 F.2d 866, 870 (4th Cir. 1962) ("The crucial words are 'cumulative net voyage profits.' Use of the word, 'cumulative' indicates an intention that profits and losses shall be cumulated over the life of the charter, just as profits and losses are cumulated over a fixed period of years for purposes of the closely related subsidy recapture. If that is not the import of the word, its use was wholly unnecessary and the entire proviso is both unnecessary and redundant.").

There is absolutely no indication in the language of the Agreement that a negative net profit (that is, a loss), as in the case of Blue Star, should be deemed to be "zero," and it defies the common, ordinary use of these terms. Moreover, under plaintiff's interpretation of the Agreement, the clause would properly read as "cumulative profits," and the word "net" would serve no purpose. Accordingly, in addition to being contrary to the plain meaning of the terms, the Court also rejects plaintiff's construction as "contrary to New York law, which disfavors interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)); *accord Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002)). In sum, based upon the plain language of the Agreement and the generally accepted definitions of the terms therein, "cumulative net profit" is determined by combining the sum total of each defendants' revenues minus costs.

With regard to East West Sales, it is clear from the record that East West Sales is neither a party to this lawsuit, nor is it a subsidiary or affiliated company of either of the defendants. As a threshold matter, East West Sales is not a party to the Agreement, and therefore cannot be bound by its terms. *Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 143 (2d Cir. 1977) ("A judgment entered by consent and stipulation is binding upon the consenting parties only. Moreover, it is the general rule that no one can be bound by an *in personam* judgment in litigation in which he or his privy was not a party.") (citing *Raylite Elec. Corp. v. Norma Elec. Corp.*, 170 F.2d 914, 915 (2d Cir. 1948), *overruled in part on other grounds by Chappell & Co. v. Frankel*, 367 F.2d 197, 200 (2d Cir. 1966); *Hansberry v. Lee*, 311 U.S. 32, 41 (1940); *Williamson v. Bethlehem Steel Corp.*, 468 F.2d 1201, 1203-04 (2d Cir. 1972)); *see also Martin v. Wilks*, 490 U.S. 755, 761-62 (1989) ("This rule is part of our 'deep-rooted historic tradition that everyone should have his own day in court.' A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.") (quoting 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4449 (1st ed. 1981)), *superseded by statute*, Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1074-76.

Moreover, to the extent that plaintiff argues that the parties contractually agreed that East West Sales' profits were meant to be part of the "cumulative net profits" calculation under the Agreement, that position is expressly contradicted by the language of the

8

Agreement, which states that payment to plaintiff should consist of "the total sum of *Defendants'* cumulative net profits . . . ." (Starnella Decl., Ex. 10 (emphasis added).) Since it is undisputed that East West Sales is not a defendant in this lawsuit, there is no interpretation of the plain language of the Agreement that permits East West Sales' net profits to be included in calculating the amount that plaintiff should receive from defendants under the Agreement.[5]

The sum of U.S. Merchandise's $23,767.78 profit and Blue Star Webbing's loss of $26,213.81 equals a loss of $2,446.03. Accordingly, the Court finds that the amount of defendants' cumulative net profits to which plaintiff is entitled under the terms of the Agreement is zero and defendants have fully complied with the provisions of the Agreement.

---

[5] The fact that Kavitt calculated a profit number for East West Sales does not mean that such profits fall within the payment required under Section 1 of the Agreement. Defendants assert that, although Kavitt initially calculated the East West Sales number and thought it was relevant, Kavitt later acknowledged that it should not be included in the calculation when he learned that East West Sales was not a party to the lawsuit. It is the Court's view that the terms of the agreement are controlling on this issue, even if the accountant had a misunderstanding about which defendants were part of the lawsuit. In other words, although his mathematical calculations are clearly binding on the parties under the Agreement, it is the terms of the Agreement that determine what is owed based on those numbers, not any view by Kavitt. Here, it is explicitly stated in Paragraph 1 that the numbers from *defendants* are to be used to calculate the cumulative net profits, and East West Sales is not a defendant. Thus, that language of the agreement is binding and the profits from East West Sales cannot be included.

### C. Reimbursement of Independent Accountant Fees

Defendants also seek reimbursement for plaintiff's half of the fee paid to Kavitt, the independent accountant, pursuant to the Agreement. However, defendants acknowledge that an email was sent to plaintiff's counsel excusing plaintiff from this obligation under certain circumstances. In particular, the email from defendants states: "your client should reimburse defendants for half of the accountants' fees if he does not request any additional documents previously requested by your accountant." (Starnella Decl., Ex. 27.) According to defendants, Kavitt never requested any documents that had been previously requested by plaintiff's accountant and which defendants had not provided to her and, thus, this exception does not apply. (Starnella Decl. ¶ 58.)

However, plaintiff's counsel counters that he "refused to pay half of the accountant's fees because the defendants kept producing documents that were never provided [to] ATD's accountant." (Davis Decl. ¶ 35.) Plaintiff also points out – and defendants concede – that, at Kavitt's request, defendants provided him with additional documents, including (1) bills of lading to Big Lots, (2) customer confirmations by Non-Foods,[6] (3) spreadsheets of East West Sales's invoiced sales details, (4) U.S. Merchandise's invoices to East West Sales, and (5) East West Sales invoices to third parties. (Starnella Decl. ¶¶ 53-55, Exs. 28, 29.) According to plaintiff, defendants are therefore responsible for paying the full costs of Kavitt's services.

---

[6] Non-Foods is a company that facilitates sales, and which received a commission for "serving as a conduit for U.S. Merchandise's purchases and sales" of the pet wipes. (Starnella Decl., Ex. 24.)

9

(Davis Decl. ¶ 35.) Defendants contend that these documents "merely duplicated information contained within the documents previously produced by Defendants," and were not documents which plaintiff's accountant had requested but defendants withheld. (Defs.' Reply Br., at 1, 3.)

While both parties agree that Kavitt requested additional documents, the relevant question for purposes of the email agreement is whether the documents requested by Kavitt had been previously requested by plaintiff's accountant, and whether such documents were withheld from plaintiff's accountant by defendants. At oral argument, plaintiff's counsel asserted that he had requested the Big Lots documentation from defendants prior to the hiring of Kavitt, while defendants assert that they "cannot find evidence of such a request from Plaintiff prior to Mr. Kavitt being appointed by the mediator." (Defs.' July 17, 2007 Letter, at 1.) Moreover, defendants assert that, even if plaintiff made such a request to Kavitt directly, without defendants' knowledge, it is clear that plaintiff's counsel "never made that request to Defendants when his accountant was calculating Defendants' cumulative net profits." (*Id.*) Based upon the conflicting accounts of the parties, the Court finds that it cannot, at this juncture, determine the appropriate distribution of Kavitt's costs between the parties. Accordingly, if defendants wish to pursue this issue, the Court must receive additional submissions from the parties, and possibly conduct an evidentiary hearing, to resolve these factual issues.

D. Attorneys' Fees and Costs Pursuant to the Agreement

The Court denies defendants' request for attorneys' fees and costs related to the instant motions. To the extent that defendants base their request upon language set forth in the Agreement, plaintiff argues that the Agreement clearly precludes such recovery. Paragraph 9 states:

> 9. Costs and Attorneys' Fees. The Parties to this Agreement shall each bear their own attorneys' fees and costs arising from the Lawsuit, from the settlement of the Lawsuit, and the performance of their obligations under this Agreement, unless specified otherwise herein.

(Starnella Decl., Ex. 10.) Defendants contend that their request should be exempted from Paragraph 9 with regard to attorneys' fees and costs because the instant motions were brought only as a result of extensive delays on the part of plaintiff's counsel: "Mr. Davis and his client's refusal to abide by the terms of the Settlement Agreement necessitated both of Defendants' motions." (Defs.' July 17, 2007 Letter, at 1.)

The Court agrees with plaintiff that an award of attorneys' fees would not be appropriate under the Agreement, given the plain language of the contract. The Agreement clearly states that each side shall bear its own fees and costs "arising . . . from the settlement of the Lawsuit and the performance of their obligations" without any exception on the basis of failure to communicate, delay, or other behavior on the part of counsel or the parties. (Starnella Decl., Ex. 10.) Moreover, it would defy reason for the Court to grant defendants'

motion to enforce the Agreement while simultaneously undermining the Agreement by allowing defendants to escape the effect of Paragraph 9. Therefore, the Court denies defendants' request for attorneys' fees and costs of the instant motions under the Agreement.

Insofar as defendants seek attorneys' fees and costs pursuant to the Court's inherent power, that request is also denied, for the reasons set forth below.

### III. MOTION FOR SANCTIONS

#### A. Standard of Review

##### 1. Section 1927

Under 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Second Circuit has held that Section 1927 sanctions are appropriate where "'there is a finding of conduct constituting or akin to bad faith,'" such as where "'the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 180 (2d Cir. 2004) (quoting *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000)). In order to meet the standard of "bad faith" required by Section 1927, "counsel must have engaged in 'serious and studied disregard for the orderly process of justice.'" *Bender v. Freed*, 436 F.3d 747, 751 (7th Cir. 2006) (quoting *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226 (7th Cir. 1984)).

At least one court has held that "a district judge need not apply a subjective standard of bad faith, but may find bad faith where an attorney engages in conduct that is so objectively unreasonable that he necessarily must have been acting in bad faith." *Forman v. Mt. Sinai Med. Ctr.*, 128 F.R.D. 591, 599 (S.D.N.Y. 1989) (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)); *see also Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) ("The proper standard under . . . § 1927 is that excess costs, expenses, or attorney's fees are imposable against an attorney personally for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.")); *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) ("'If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious.'") (quoting *Riddle & Assocs. P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005)) (additional citations omitted). While courts sometimes hesitate to impose Section 1927 sanctions out of a concern that zealous representation may be chilled, "the risk that the imposition of sanctions will have a chilling effect on an attorney's zealous representation of his client is at a minimum when the misconduct occurs . . . in the context of effectuating a previously agreed-upon settlement. In this context, the courts should be able to expect counsel to work together reasonably to accomplish what they have agreed in the presence of the Court to do." *Id.* (citing H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2716, 2781, 2782 and *cited in Braley v. Campbell*, 832 F.2d at 1512); *see also Ullmann v. Olwine, Connelly, Chase,*

*O'Donnell & Weyher*, 123 F.R.D. 253, 262 (S.D. Ohio 1987) (noting that "'[a]greements settling litigation are solemn undertakings, involving a duty upon the involved lawyers, as officers of the Court, to make every reasonable effort to see that the agreed terms are fully and timely carried out'" and granting sanctions against plaintiff for repudiating a settlement agreement) (quoting *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976)).

### 2. Inherent Power

A court may also award sanctions – in the form of attorneys' fees and costs – pursuant to its inherent power. "It is well established that courts have the inherent power to impose a variety of sanctions on both litigants and attorneys to regulate their docket, promote judicial efficiency, and deter frivolous filings." *Morris v. Adams-Millis Corp.*, 758 F.2d 1352, 1358 (10th Cir. 1985) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-67 (1980), *superseded on other grounds by statute*, Antitrust Procedural Improvements Act of 1980, Pub. L. No. 96-349, § 3, 94 Stat. 1154 (1980)) (additional citations omitted). As in the case of Section 1927 sanctions, in order to impose sanctions pursuant to its inherent power, the Court must find that counsel's behavior "constituted or was tantamount to bad faith." *Roadway*, 447 U.S. at 767; *Oliveri*, 803 F.2d at 1273 ("[W]e hold today that an award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power.") (citing *Colucci v. N.Y. Times Co.*, 533 F. Supp. 1011, 1013-14 (S.D.N.Y. 1982)).

### B. Analysis

Defendants argue that plaintiff's counsel engaged in sanctionable conduct "by failing to communicate reasonably with Defendants' counsel, disregarding the Court's authority and orders, creating numerous delays, missing deadlines and breaching the Settlement Agreement in an effort to extort a monetary payment from Defendants." (Defs.' Sanctions Br., at 14; *see also* Defs.' Br., at 18.) However, after carefully examining the record and the totality of the circumstances, the Court finds that there has been an insufficient showing of bad faith to warrant the imposition of sanctions or attorneys' fees and costs against plaintiff pursuant to Section 1927 or the Court's inherent power.

Specifically, defendants charge that counsel for plaitniff engaged in the following conduct: (1) failing to provide plaintiff's accountant with relevant information to assist in her calculations (Defs.' Br., at 17-18); (2) waiting until June 7, 2006, six weeks after the Agreement had been finalized on May 23, 2006, to deliver defendants' documents to plaintiff's accountant for review, despite the Agreement's contemplation that all calculations would be completed within sixty days (Def.'s Sanctions Br., at 17; Starnella Decl. ¶¶ 21, 24); (3) failing to provide plaintiff's accountant's report to defendants until July 25, 2006, over two weeks after Davis received it on July 7, 2006 (Defs.' Sanctions Br., at 7; Starnella Decl. ¶¶ 30); (4) declining to respond to plaintiff's calls regarding plaintiff's accountant's report (Defs.' Sanctions Br., at 7; Starnella Decl. ¶¶ 31, 35); (5) refusing to participate in a Court-ordered status conference with counsel and plaintiff's accountant (Defs.' Sanctions Br., at 7; Starnella Decl. ¶¶ 36-40); (6) refusing to sign the independent accountant's engagement

letter or to pay plaintiff's portion of the independent accountant's retainer (Defs.' Sanctions Br., at 10; Starnella Decl. ¶ 50); (7) continuing to request unnecessary and duplicative documentation from defendants (Defs.' Sanctions Br., at 10, 12-13: Starnella Decl. ¶¶ 34, 60; Ex. 24); (8) refusing to participate in a status conference with the independent accountant and defendants' counsel (Defs.' Sanctions Br., at 12; Starnella Decl. ¶ 60); (9) declining to communicate with defendants' counsel regarding the independent accountant's findings (Defs.' Sanctions Br., at 13; Starnella Decl. ¶¶ 63-66, Ex. 32); and (10) seeking to restore the litigation to the court calendar and re-open discovery. In response, Davis denies that he has not refused to confer with counsel (Pl.'s Br., at 2), and contends that defendants have behaved egregiously in withholding documents from plaintiff (Pl.'s Br., at 3-4).

In this instance, while the Court acknowledges that plaintiff's counsel may have caused undue delay in resolving the outstanding issues in this case post-settlement, his behavior does not clearly demonstrate "bad faith," nor does it rise to the level of sanctionable conduct contemplated in the case law regarding imposition of sanctions pursuant to Section 1927 or the Court's inherent power. There obviously have been lengthy and contentious communications and disputes among counsel since the execution of the Agreement, including disputes about the accountant's calculations, documents underlying the accountant's calculations, and the interactions between counsel and the accountants. In connection with these issues, plaintiff's counsel has attempted to outline his client's position to the court at conferences and in his written submissions. Although the Court has rejected all the arguments made by plaintiff's counsel as being without merit and views them as being extremely weak, the Court does not find the conduct to be sufficiently egregious to be sanctionable. The Court recognizes that there are some indicia of possible bad faith by plaintiff in terms of delay, shifting positions, and the presentation of weak arguments. However, there have been some occasions where plaintiff's counsel has also displayed some effort to avoid protracted litigation. In fact, at oral argument, plaintiff's counsel abandoned his client's objections to Kavitt's calculations and his requests for further discovery, and simply sought to focus on the language of the Agreement regarding "cumulative net profits." Although defendants argue that such acts demonstrate further bad faith, the Court viewed such act as a good faith effort (albeit at a late stage) to narrow the issues and avoid further delay in resolution of the post-settlement dispute. In short, the Court does not believe that there is sufficient indicia of vexatiousness to warrant the relief being sought. Accordingly, defendants' motion for sanctions and their request for attorneys' fees and costs related to the instant motions are denied.

IV. CONCLUSION

For the foregoing reasons, defendants' motion to enforce the settlement agreement is GRANTED, with the exception of the fee issue regarding the independent accountant. Defendants' request for attorneys' fees and costs associated with their motion is DENIED. Defendants' motion for Section 1927 sanctions is also DENIED.

13

Defendants shall notify the Court within fifteen (15) days by letter as to whether they wish to pursue reimbursement from plaintiff for its half of the independent accountant's fees.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 28, 2007
Central Islip, New York

* * *

The attorney for plaintiff is Lowell B. Davis, Esq., Law Office of Lowell B. Davis, One Old Country Road, Carle Place, New York 11514. The attorneys for defendants are Amy J. Benjamin, Esq., and Kathryn Anne Teresa Starnella, Esq., Darby & Darby P.C., 805 Third Avenue, New York, New York 10022-7513.